**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SUKETU PATEL** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.  22-1010** |
| | : | |
| **CF FRESH LLC** | : | |

## **MEMORANDUM**

**KEARNEY, J.**                                                    **November 7, 2022**

Business executives working for years in an office culture set by the company's owner must recognize the company's new owner may enforce different disclosed expectations and rules. We today study a company's new owner's decision to fire an Asian man of Indian ancestry along with his Caucasian team member within ten months of buying the company. The employees faced a new environment when their employer's new owner enforced rules confirmed in a policy signed by the employees. There is no dispute the employees lied to their boss about their whereabouts on a workday and the new owner enforced its policies with all employees. The employees could not then, and cannot today, explain why they lied to the boss. The new owner decided to fire the two employees within days of the demonstrated lie. The Asian man now sues claiming the new owner fired him because of his race and ancestry or because he complained to his boss ten weeks earlier about reprehensible racist comments by former company executives. The parties engaged in extensive discovery. The employer now moves for summary judgment. We find no genuine issue of material fact requiring a jury's review on whether the employer violated federal law in firing the Asian man. The employee failed to adduce evidence his employer fired him because of race or ancestry discrimination or retaliation. He also chose not to adduce evidence supporting a breach of his employment agreement claim. We grant the employer's motion for summary judgment on the former employee's discrimination, retaliation, and breach of contract claims.

I.      **Undisputed Facts**[1]

Suketu Patel is an Asian man of Indian ancestry. He began working as the Chief Financial Officer for Country Fresh Mushroom Company on November 2, 2015 under by a written employment agreement.[2] He agreed to a one year term of employment automatically renewed for one year terms unless Mr. Patel or Country Fresh gave written notice of non-renewal two months before the term expired.[3] Either party could also terminate the employment with or without reason on forty-five days written notice.[4] CF Fresh would not pay a severance unless the parties terminated the agreement outside of the two-month  non-renewal option.[5]

Mr. Patel reported directly to Country Fresh's Chief Executive Officer Edward Leo from his start in November 2015 until Country Fresh's owners sold the company on January 31, 2019.[6] Laura Matar served as Country Fresh's President at the same time.[7] Country Fresh's Accounting Manager Nick Stalloni (a white man) reported directly to Mr. Patel.[8] Mr. Patel worked remotely if he needed to "take some time" and could do so "as long as [he] got his work done."[9] Country Fresh, through CEO Leo and President Matar, approved reimbursing Mr. Patel for meals when he and Mr. Stalloni worked long hours or worked through lunch or dinner.[10] Country Fresh never increased Mr. Patel's compensation.[11]

CEO Leo and others routinely used racially disparaging language about minority groups. Mr. Patel witnessed Mr. Leo make racist and derogatory comments and jokes about minority groups, including Hispanics, African–Americans, and Jews, disparaging remarks about the Trayvon Martin shooting, jokes about shooting then-President Obama, referring to Jewish individuals as "members of the tribe" and remarks about "opening fire" on Jews, and referring to a Mexican employee as the "HMIC" meaning "Head Mexican In Charge."[12] Mr. Patel also believes

Mr. Leo routinely engaged in racist and discriminatory comments with an outside consultant Rich Ogorek hired by Country Fresh in 2018 to assist in trying to sell the company.[13]

### New rules once Giorgi buys Country Fresh in January 2019.

Giorgi Global Holdings, Inc. acquired Country Fresh on January 31, 2019 and renamed the company CF Fresh LLC.[14] Mr. Patel then began reporting to Giorgi's Chief Financial Officer Michael Sobota.[15] Georgi assumed Mr. Patel's Employment Agreement with Country Fresh (now renamed CF Fresh) subject to annual renewal in November 2019.[16]

Mr. Patel signed Giorgi's Travel, Meals, and Entertainment Policy.[17] Giorgi's Policy permitted "personal meals" "commensurate with the employee's normal eating practices" with conditions including the policy "is not intended to reimburse employees beyond reasonable limits" And allowed for reimbursement for "reasonable expenses of entertaining individuals not in the employ of the Company" "[w]here a bona fide business purpose has been served."[18]

Mr. Patel swore he understood Giorgi's Policy to allow the expensing of meals with co-workers if "that is worked out with your supervisor"; his "boss [CFO Sobota] told [him] he could do it"; the expensing of meals with co-workers were "practices … in place right from the get-go from [20]16, [20]17, onward"; no one ever told him he could not expense meals; and he "got express permission to do it."[19]

### May 2019 presentation by Mr. Patel to Joe Caldwell, President of a CF Fresh affiliate.

Mr. Patel prepared a presentation for CFO Sobota and Joe Caldwell, President of a CF Fresh affiliate in May 2019. Mr. Caldwell told Mr. Patel before the presentation: "I'm not a nice guy. I'm not. I'm only nice to people to get information. Why do you think I have been so nice to [President] Matar? I can make life very difficult for *people like you*."[20]

3

***Mr. Patel wants a pay raise and mentions disparate treatment and
discrimination while CF Fresh decides to not renew the contract.***

Mr. Patel repeatedly discussed a pay raise with CFO Sobota.[21]   The parties specifically identify Mr. Patel's pay request in August 2019 when he met with CFO Sobota to discuss Mr. Patel's compensation going forward as Mr. Patel transitioned into a sales-focused role.[22] Mr. Patel and the CF Fresh witnesses dispute the cause for their August meetings, but this dispute is immaterial to present claims and defenses. But the parties do not dispute Giorgi's General Counsel and Chief Compliance Officer Michael Rettig emailed CFO Sobota and Chief Human Resources Officer DeLillo a draft notice of non-renewal of Mr. Patel's employment agreement on August 27, 2019 – three days before an August 30, 2019 meeting to address Mr. Patel's pay issues.[23]

Mr. Patel and CFO Sobota met on August 30, 2019. CF Fresh asserts the two met to discuss compensation benchmarking and to communicate CF Fresh's decision not to renew Mr. Patel's employment agreement.[24] Mr. Patel denies this assertion, contending his August 30 meeting with CFO Sobota discussed only his transition to a sales-focused role and the commensurate compensation.[25] But Mr. Patel's assertion is contradicted by his sworn admission CFO Sobota told him CF Fresh would not renew his employment agreement at the August 30, 2019 meeting.[26]

Mr. Patel testified CFO Sobota "was not receptive" at their August 30 meeting to requests for increased pay and told Mr. Patel he "made enough."[27] Mr. Patel asserts he became "very uncomfortable" by CFO Sobota's comments and expressed concern CF Fresh did not treat him "on a level playing field" as his white counterparts.[28] Mr. Patel does not adduce evidence of pay disparities between him and his white counterparts or evidence suggesting CF Fresh treated him differently than his white counterparts. Mr. Patel also told CFO Sobota about Mr. Leo's comments which he thought created a hostile and racist culture causing Mr. Patel "significant discomfort."[29]

Mr. Patel also reported Mr. Caldwell's May 19, 2019 "people like you" comment and expressed feeling threatened by the comment.[30]

Mr. Patel admits the first and only time he raised a concern about discrimination during his employment with CF Fresh occurred during the August 30, 2019 meeting with CFO Sobota.[31] Mr. Patel concedes Mr. Leo made those comments in 2015 and 2017 but contends he understood Mr. Leo continued working for CF Fresh in a consulting role and, although not present in the office on a regular basis, continued to make racially offensive comments after Giorgi's acquisition.[32] Mr. Patel identified only the "Head Mexican In Charge" comment as the only comment made by Mr. Leo post-acquisition.[33]

Mr. Patel contends CFO Sobota became upset during the August 30 meeting after Mr. Patel reported Mr. Leo's and Mr. Caldwell's comments and after Mr. Patel expressed concern the company did not treat him equal to his white counterparts. And Mr. Patel claims CFO Sobota retorted if Mr. Patel "felt that way, then [the company] should just cancel" Mr. Patel's employment agreement.[34] Mr. Patel asserts CFO Sobota told him Chief Human Resources Officer DeLillo would be sending him an email regarding his employment agreement. Chief Human Resources Officer DeLillo emailed Mr. Patel notifying him of the non-renewal of his Employment Agreement later the same day.[35] The notice advised Mr. Patel CF Fresh would not renew the one-year term for the employment agreement and he would be an at-will employee as of November 2, 2019.[36]

### Mr. Patel's and CFO Sobota's relationship after their August 30 meeting.

Mr. Patel contends CFO Sobota began to retaliate against him for complaining of discrimination at their August 30, 2019 meeting.[37] Mr. Patel cites two examples of retaliation: (1) CFO Sobota stopped communicating with Mr. Patel for three weeks after the August 30, 2019 meeting despite their regular communications before August 30; and (2) CFO Sobota told Mr.

Patel on September 18, 2019 he could no longer attend a Produce Marketing Association sales conference in California despite his understanding the company had earlier agreed he could attend.[38]

Mr. Patel continued to report directly to CFO Sobota and had a dotted-line reporting to President Matar as an at-will employee.[39]  CFO Sobota swore he became concerned about Mr. Patel's performance in 2019 both before and after the August 30, 2019 meeting.[40] CFO Sobota testified Mr. Patel became aggressive during the August 30 meeting and CFO Sobota later learned of other examples of Mr. Patel's aggression in the workplace.[41] CFO Sobota testified Mr. Patel spoke negatively about CF Fresh's "upper management," particularly Mr. Caldwell.[42] CF Fresh cites text messages between Mr. Patel and his subordinate Mr. Stalloni in July and August 2019 containing foul language, racially and sexually offensive test messages and comments, including with regard to Mr. Caldwell and Mr. Leo.[43] There is no evidence CFO Sobota or CF Fresh management knew of the text messages between Mr. Patel and Mr. Stalloni at this time.

CFO Sobota then learned from President Matar in September 2019 she had difficulty locating Mr. Patel when he should have been in the office. The Human Resources department began tracking Mr. Patel's attendance. The company found Mr. Patel failed to report to the office fifteen times between September 3 and November 15, 2019.

CFO Sobota also learned Mr. Patel expensed multiple lunches to the company after Giorgi bought Country Fresh. CFO Sobota requested Mr. Patel's expense reports from the accounting department showing between February 7 and November 11, 2019, Mr. Patel and his subordinate Mr. Stalloni expensed sixty-seven lunches totaling over $3,500. Mr. Patel concedes he and Mr. Stalloni made these charges and concedes having lunch with Mr. Stalloni approximately fifty of

the sixty-seven charged lunches. Mr. Patel swears CFO Sobota approved the practice of expensing meals and President Matar approved his expenses for the sixty-seven lunches.[44]

### *Mr. Patel lies to President Matar.*

But Mr. Patel's biggest problem arose from lying to his boss. Mr. Patel notified President Matar by a November 11, 2019 email he and Mr. Stalloni would be attending an off-site meeting the same day. CF Fresh contends Mr. Patel lied to President Matar in this email.[45] Mr. Patel contends he did not lie; he simply permitted Mr. Stalloni to "take a mental health day" but he continued to work on November 11.[46]

But text messages between Mr. Patel and Mr. Stalloni show the two employees did not attend an off-site meeting:

| | |
|---|---|
| Mr. Patel: | Couldn't remember if I told you but I'm going to work from home today. I know you need time to get stuff together for close so I'll leave you alone. Let me know if you need me for anything. I'll just be working on the customer budget stuff. |
| Mr. Stalloni: | Still searching for the motivation to get myself ready to leave. I'll let you know how that works out. |
| Mr. Patel: | F*** it stay home. Sh** will be there tomorrow. |
| Mr. Stalloni: | You sure? Ah f*** it [you are right]. What's the worst that could happen lol. |
| Mr. Patel: | Yup I'm sure. |
| Mr. Patel: | Just tell Cindy you and I have offsight [sic] budget meetings.[47] |
| Mr. Stalloni: | I already texted her some basic sh** about not being able to come in. She doesn't need to know specifics. Not sure she knows what offsight [sic] means. |
| Mr. Patel: | Lol |
| Mr. Patel: | Cool I'll tell Laura [President Matar] you and I are out today. |

| Mr. Stalloni: | Word Do you mind if I use the same excuse to get out of an at meeting [sic] with Greg?[48] … |
|---|---|
| Mr. Patel: | You have to ask[49] |

Mr. Patel then lied to his boss. Immediately following Mr. Patel's and Mr. Stalloni's November 11, 2019 text exchange, Mr. Patel emailed President Matar advising: "Laura – Nick [Stalloni] and I have offsight [sic] budget and ibp [sic] meetings but if you need us, we are available via email or phone. Thanks."[50] Mr. Patel swore he did not know why he told President Matar he would be at an off-site meeting when he had no off-site meeting and why he did not simply tell President Matar he would be working from home if the company allowed it.[51]

CF Fresh's management knew of no off-site  meetings on November 11.

On November 18, 2019, CFO Sobota and Chief Human Resources Officer DeLillo confronted Mr. Patel with his absences, his dishonesty regarding his attendance on November 11, and excessive lunch expenses. Chief Human Resources Officer DeLillo asked Mr. Patel to explain his absences and the November 11 email to President Matar. Mr. Patel concedes he did not explain.

### CF Fresh officers Sobota and DeLillo fire Messrs. Patel and Stalloni.

CF Fresh fired Mr. Patel and Mr. Stalloni, a white man, on November 18, 2019.[52] CF Fresh contends it fired Mr. Patel (as well as Mr. Stalloni)  for his ongoing absences, his dishonesty on November 11, 2019, and excessive meal expenses and terminated.[53]

No party disputes the persons allegedly making racially disparaging statements in earlier years and months (i.e., Messrs. Caldwell, Leo, and Ogorek) did not play a role in firing Mr. Patel.[54] Mr. Patel conceded CF Fresh did not employ either Mr. Leo or Mr. Ogorek when CF Fresh fired him.[55] Mr. Patel also swore Mr. Caldwell was not his boss and swore he did not know if Mr. Caldwell had a role in CF Fresh's decision to fire him:

Q.      Okay. Is Joe Caldwell – was Joe Caldwell one of your bosses?

A.      No.

Q.      Okay. To your knowledge, did Joe Caldwell have anything to do with your termination?

A.      I don't know.

Q.      So if Joe Caldwell had – if I represented to you that Joe Caldwell was not a decision maker or involved in the decision to terminate your employment, you would have no reason to dispute that, correct?

A.      I would have a reason to dispute that. He was very high up in the chain. It was very, very likely he was involved in this decision.

Q.      Okay. But you don't know?

A.      I don't know.

Q.      Okay. So you could be guessing?

A.      Sure.[56]

Mr. Patel also swore:

Q.      Okay. Do you have any reason to believe that Joe Caldwell was part of the decision to terminate your employment?

A.      I would think that he was very high up the chain.

Q.      But you don't know one way or the other?

A.      I can only surmise.[57]

### *Mr. Patel sues CF Fresh.*

Mr. Patel filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on September 14, 2020.[58] Mr. Patel claimed discrimination based on his race, color, and national origin and retaliatory termination. He did not claim discrimination or retaliation based on the August 30, 2019 notice of non-renewal of his Employment Agreement.

Mr. Patel filed an amended charge of discrimination with the EEOC, cross-filed with the Pennsylvania Human Relations Commission on December 14, 2020.[59] Mr. Patel claimed discrimination based on race and national origin and retaliation in both his termination and non-renewal of his Employment Agreement. The EEOC issued Mr. Patel a right-to-sue letter on December 30, 2021.[60] Mr. Patel then sued CF Fresh.[61] He alleges discrimination based on race and ancestry and retaliation under Title VII and section 1981 and a common law breach of contract claim.[62]

## II.    Analysis

CF Fresh now moves for summary judgment on Mr. Patel's claims.[63] CF Fresh argues we must enter judgment in its favor because: (1) to the extent Mr. Patel's claims of discrimination and retaliation are based on CF Fresh's decision to not renew the Employment Agreement, they are time-barred; (2) Mr. Patel failed to establish a prima facie case of race or ancestry disparate treatment for his termination in violation of Title VII and section 1981; (3) Mr. Patel failed to establish a prima facie case of retaliation under Title VII and section 1981; (4) even if Mr. Patel established a prima facie case of discrimination or retaliation, he fails to show CF Fresh's legitimate, non-discriminatory and non-retaliatory reasons for his termination are pretext; and (5) Mr. Patel's breach of contract claim fails on the merits. CF Fresh also requests, in the alternative, partial summary judgment for Mr. Patel's failure to mitigate his damages.

Mr. Patel opposes summary judgment on the federal issues but not on the breach of contract. He argues: (1) he established a prima facie case of race and national origin discrimination under Title VII and section 1981; (2) he established a prima facie case of retaliation under Title VII and section 1981; and (3) he produced evidence of pretext in both his discrimination and retaliation claims.

We begin with Congress's directive in Title VII making it an "unlawful employment practice for an employer to … discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race … or national origin."[64] Congress in Title VII also makes it unlawful for an employer to retaliate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter."[65] Congress, like in Title VII, prohibits employment discrimination and retaliation based on race in section 1981 providing "[a]ll persons within the jurisdiction of the United States shall have the same right in every State … to make and enforce contracts … as enjoyed by white citizens …"[66]

We grant CF Fresh's motion finding no genuine issues of material fact and it is entitled to judgment as a matter of law on Mr. Patel's discrimination, retaliation, and breach of contract claims.

### A.     Mr. Patel's Title VII disparate treatment and retaliation claims based on the August 30, 2019 non-renewal of his Employment Agreement are time-barred.

Mr. Patel may not proceed on a discrimination claim based on CF Fresh's August 30, 2019 decision to not renew his employment agreement.  He did not timely file this claim.

A charge of discrimination under Title VII must be filed within 180 days of the alleged unlawful employment practice.[67] The 180-day period is extended to 300 days for plaintiffs residing in "deferral" states like Pennsylvania having an agency – like the Pennsylvania Human Relations Commission – authorized to grant relief for federally prohibited employment discrimination. Plaintiffs in deferral states "must resort to that state remedy before they will be allowed access to federal judicial relief."[68] In such cases, plaintiffs in Title VII cases "who file in deferral states, must submit their administrative discrimination charge within 300 days of the challenged employment action."[69]

11

Mr. Patel's claim for relief under Title VII from CF Fresh's alleged employment discrimination in deciding not to renew his Employment Agreement on the basis of his race and ancestry and in retaliation for complaining about discriminatory comments in the workplace may proceed only if he filed his administrative charge of discrimination with the EEOC within 300 days of the non-renewal decision.

Mr. Patel did not timely file an administrative claim for discrimination under Title VII challenging CF Fresh's August 30, 2019 decision to not renew his Employment Agreement. Mr. Patel does not dispute CFO Sobota advised Mr. Patel on August 30, 2019 CF Fresh would not renew his Employment Agreement. He had until June 25, 2020 to file a Title VII charge with the EEOC regarding the non-renewal of his Employment Agreement. He did not do so.

Mr. Patel also does not dispute CF Fresh terminated Mr. Patel on November 18, 2019, the last date of his challenged employment actions. Mr. Patel filed his first EEOC charge on the last day of the 300-day period, Monday, September 14, 2020.[70] He did not raise the non-renewal of his Employment Agreement in his September 14, 2020 charge. He does not today argue the September 14, 2020 charge somehow saves his Title VII claims based on the Employment Agreement. Mr. Patel seemingly concedes his claims based on non-renewal are untimely.[71] He now argues the non-renewal can be considered for purposes of "background and context to his timely claims."[72] We dismiss Mr. Patel's claims CF Fresh's August 30, 2019 decision to not renew his Employment Agreement violates Title VII as time-barred.

### B.    We enter judgment in favor of CF Fresh on both disparate treatment claims.

Claims of disparate treatment based on race or ancestry under Title VII and section 1981 are analyzed under the three-step framework detailed by the Supreme Court in *McDonnell Douglas Corp. v. Green*.[73] Mr. Patel must first establish a prima facie case of discrimination.[74] If he

succeeds, the burden shifts to CF Fresh to articulate a legitimate, nondiscriminatory reason for Mr. Patel's termination. If CF Fresh does so, Mr. Patel must establish by a preponderance of the evidence CF Fresh's proffered reason for his termination is pretext for discrimination.[75] Under the *McDonnel Douglas* burden-shifting framework, "the ultimate burden of proving intentional discrimination always rests with the plaintiff."[76]

### 1. Mr. Patel fails to establish a prima facie case of race or ancestry-based disparate treatment in his termination.

To establish a prima facie case of disparate treatment race and ancestry discrimination, Mr. Patel must show: (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of intentional discrimination.[77] "The central focus of the prima facie case is always whether the employer is treating some people less favorably than others because of their race, color, religion, sex, or national origin."[78]

Mr. Patel contends CF Fresh terminated him as an at-will employee on November 18, 2019 because of his race and/or ancestry citing: CEO Leo's racist and derogatory comments about minority groups including Hispanics, African-Americans, and Jews during the pre-acquisition time period of November 2015 to January 31, 2019; racist and derogatory comments made in 2018 by Consultant Ogorek; Mr. Caldwell's alleged May 2019 statement "I can make life very difficult for people like you"; and, Offices Sobota's August 30, 2019 decision to not renew his Employment Agreement.[79]

CF Fresh moves for judgment as a matter of law challenging, as a matter of law,  the fourth element of the prima facie case: Mr. Patel failed to produce evidence giving rise to an inference of discrimination based on his race and/or ancestry in its decision to terminate his employment in

November 2019. CF Fresh argues there is no evidence suggesting a connection between his race and/or ancestry and his termination:

There is no evidence an employee outside Mr. Patel's protected class – or any employee for that matter – had an employment contract with Country Fresh, CF Fresh, or Giorgi and maintained an employment contract after 2019.  There is no evidence of employees outside his protected class who excessively expensed meals, failed to report to the office fifteen times over a two-month period, and lied about his work location who CF Fresh did ***not*** terminate. CF Fresh cites its termination of Mr. Stalloni, who is White, on the same day as Mr. Patel for the similar conduct, as well as a White employee in 2017 for lying as to his location during work hours. Mr. Patel objects to this individual as an appropriate comparator as there is no record evidence of the individual's job title, job duties, or work from home arrangement.

There is no evidence CFO Sobota and Chief Human Resources Officer DeLillo – the decisionmakers on the non-renewal of the Employment Agreement and to terminate Mr. Patel – made racist or discriminatory comments to him or any employee.

There is no evidence the individuals who made discriminatory comments – Mr. Leo, Mr. Ogorek, and Mr. Caldwell – decided to not renew Mr. Patel's Employment Agreement or fire him over ten weeks later. Mr. Patel concedes CF Fresh did not employ Mr. Leo and Mr. Ogorek when CF Fresh fired him. And although Mr. Patel "believes" or "surmises" Mr. Caldwell played a role in Officers Sobota's and DeLillo's decision to fire him, He offers no evidence Mr. Caldwell did so. Mr. Patel chose not to depose Mr. Caldwell and fails to cite evidence other than his unsupported belief.

Comments by Mr. Leo, Mr. Ogorek, and Mr. Caldwell as evidence of a race and/or ancestry-based termination are temporally remote and not directed at Asians of Indian descent. For

example, Mr. Leo's comments occurred before Giorgi's acquisition of Country Fresh and after the acquisition, but we have no evidence of when made or the substance of the comments. Mr. Ogorek's comments occurred in December 2019. Mr. Caldwell's comment occurred in May 2019. CF Fresh argues these comments, made months and years before his termination, cannot support an inference of discrimination.

Mr. Patel responds the comments by non-decisionmakers Mr. Leo, Mr. Ogorek, and Mr. Caldwell, even the temporally remote comments made in 2015 and 2018, are sufficient to support an inference of intentional discrimination. He argues evidence of Mr. Leo's and Mr. Ogorek's racist comments and jokes about members of other protected classes as well as the non-renewal of his Employment Agreement support an inference of discrimination, satisfying the fourth element of the prima facie case.

Mr. Patel's cited authorities arise in much different situations and offer little guidance today. For example, Mr. Patel cites Judge Jones's analysis in *Kamara v. Horizon House, Inc.* to argue Mr. Leo's and Mr. Ogorek's comments about other classes of individuals – African Americans, Hispanics, and Jews – is evidence of impermissible animus and can support an inference of discrimination against him as an Asian man of Indian ancestry.[80] In *Kamara*, an employee of Liberian origin sued his employer alleging discriminatory discharge under Title VII and section 1981. Employee's supervisor made racist comments against Africans generally and disciplined two Liberian-born employees found sleeping on the job more severely than two American-born employees also found sleeping on the job. Judge Jones found the employee adduced sufficient facts in the record to make it more likely than not the factfinder could find an inference of discrimination against him as an African.[81]

The facts in *Kamara* are distinguishable. First, the evidence showed impermissible discrimination against other employees from Liberia in the form of more severe discipline than their American-born counterparts. And racist comments made by supervisors about Africans further supported an inference of discrimination. Mr. Leo and Mr. Ogorek allegedly made these statements years before Mr. Patel's termination. While Mr. Patel alleged Mr. Leo continued to make racist comments after Giorgi's acquisition in his role as a consultant – the Head Mexican In Charge comment – we have no evidence when such comments were made in relation to the time of Mr. Patel's termination. Neither Mr. Leo nor Mr. Ogorek – neither of whom acted as Mr. Patel's supervisor – made Anti-Asian or Anti-Indian comments or jokes. Unlike *Kamara*, there is no evidence of comparator evidence, no racist comments by a supervisor, no racist comments by a decisionmaker, and no racist comments about Asians or Indians.

Like Mr. Leo and Mr. Ogorek, Mr. Caldwell is not a decisionmaker with regard to Mr. Patel's termination. Mr. Caldwell's "people like you" comment in May 2019 is not obviously racial. There is no racial nexus to this statement and "no reasonable juror could attach a racial meaning to that comment in the absence of any other evidence regarding the context in which that comment was made or other evidence [the speaker] harbored any racial prejudice" and, even if the "people like you" comment could be construed as race-based, it does not give rise to an inference Mr. Patel's termination is racially motivated where Mr. Caldwell had no involvement in the decision to terminate him.[82]

Racist comments by non-decisionmakers "may provide some relevant evidence of discrimination" and "may … be considered by the jury as evidence of the corporate culture in which the employment decision to discharge [a plaintiff] was made" but our Court of Appeals "made clear … comments by those individuals outside the decision making chain are stray remarks

which, *standing alone*, are inadequate to support an inference of discrimination."[83] Mr. Patel fails

to show how much earlier racist comments about other racial, ethnic, and religious groups and a

comment not obviously racial relates to CFO Sobota's and Chief Human Resource Officer

DeLillo's November 2019 decision to fire him. "Stray remarks by non-decisionmakers or by

decisionmakers unrelated to the decision process are rarely given great weight, particularly if they

were made temporally remote from the date of the decision."[84]

Mr. Patel also argues we can consider the August 30, 2019 decision to not renew his

employment agreement as evidence of disparate treatment because CF Fresh "willingly assumed

the obligations" of the employment agreement at the time it acquired Country Fresh and kept the

employment agreement in place for seven months until Mr. Patel complained of discrimination.

But this argument misses the mark, conflating his claim for disparate treatment with retaliation.

Mr. Patel does not explain how a factfinder could infer race and/or ancestry-based discrimination

based on CF Fresh's required assumption of contractual obligations in January 2019 which it must

honor subject to a contractual defense and its August 2019 decision to not renew his employment

agreement. CF Fresh honored the contract terms and provided timely notice. Mr. Patel offers no

comparator or similarly situated employee with an employment agreement not in his protected

class treated more favorably than him. CF Fresh also fired Mr. Stalloni, a white employee, for the

same conduct, and there is evidence in the record Giorgi terminated a white employee in 2017 for

similar conduct.[85]

Mr. Patel bears the burden to produce evidence CF Fresh fired him under circumstances

which could give rise to an inference of discrimination. He does not do so. He does not adduce

evidence of a single racist or discriminatory conduct about any protected class, including Asian

and Indian, from decisionmaker officers employed by CF Fresh. Mr. Patel seeks to impute

comments made by non-decisionmakers, some made years before his firing and the most recent six months before his termination, which do not evidence racial bias standing alone. He does not adduce evidence CF Fresh treated Mr. Patel less favorably than others because of his race or ancestry. He fails to meet his burden of establishing a prima facie case of disparate treatment discrimination.

### 2.   Mr. Patel also fails to show CF Fresh's articulated legitimate, nondiscriminatory reasons for its actions are pretext.

Even if Mr. Patel met his burden on the fourth element of the prima facie case, he does not show through direct or circumstantial evidence the legitimate, nondiscriminatory reason for his termination is "merely pretext" and his "protected status … [is] the determinative factor of the adverse employment action."[86]

To defeat summary judgment at the pretext step, Mr. Patel "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." [87] Mr. Patel may meet his burden by "painting the [employer's articulated reasons] as weak, implausible, contradictory, or incoherent. Or, for example, 'by showing that the employer in the past had subjected [the employee] to unlawful discriminatory treatment, [or] that the employer treated other, similarly situated persons not of his protected class more favorably.'"[88]

Mr. Patel fails to meet his burden. He focuses on pretext in the context of his retaliation claim, relying on the "same factors" demonstrating causation in his retaliation claim.[89] For the reasons supporting our conclusion Mr. Patel does not meet the fourth element of the prima facie case of disparate treatment, he fails to raise an issue of fact regarding pretext. He fails to cite evidence from which a factfinder could reasonably either disbelieve CF Fresh's articulated

legitimate, nondiscriminatory reasons for firing Mr. Patel or believe an "invidious discriminatory reason was more likely than not a motivating or determinative cause" of CF Fresh's November 2019 decision to fire him.

Mr. Patel makes much of his earlier approved lunch expenses and remote work. But there is no dispute he sent CF Fresh's President a November 11, 2019 email telling her he and Mr. Stalloni would be at an off-site meeting when no such meeting existed. He could not explain why he sent the email to President Matar. There is nothing to show CF Fresh's reason is "weak, implausible, contradictory, or incoherent" or to show CF Fresh treated other similarly situated employees not of his protected class more favorably.

We enter judgment in CF Fresh's favor on Mr. Patel's disparate treatment claim under Title VII and section 1981.

### C.    Mr. Patel established a prima facie case of retaliation but cannot show pretext.

We also apply the *McDonnell Douglas* framework to evaluate whether Mr. Patel adduced evidence of genuinely disputed material facts supporting his retaliation claims under Title VII and section 1981.[90] Like a disparate treatment claim, Mr. Patel must first establish a prima facie case of retaliation, if he does so the burden shifts to CF Fresh to present a legitimate, non-retaliatory reason for the termination, and, if CF Fresh meets its burden, the burden shifts back to Mr. Patel to demonstrate the proffered reasons is false and retaliation is the real reason for his termination.[91]

To establish a prima facie case of retaliation, Mr. Patel must show (1) he engaged in protected employee activity; (2) adverse action by the employer either after or contemporaneous with his protected activity; and (3) a causal connection between the protected activity and the adverse employment action.[92]

The burden is on Mr. Patel to establish causation "at two stages of the case: initially, to demonstrate a causal connection as part of the prima facie case, and at the final stage of the *McDonnell Douglas* framework to satisfy [his] ultimate burden of persuasion by proving pretext."[93] Mr. Patel has a "higher causal burden" in his retaliation claim than a claim asserting direct status-based discrimination under Title VII.[94] The jurisprudence developed by our Court of Appeals over the years describes the standard required of a plaintiff to show a causal connection between retaliatory animus and an adverse employment action as a "determinative effect" and "the real reason" for the employer's adverse employment action.[95] The "determinative effect" and "real reason" causation standards are "functionally the same" as the Supreme Court's "but for" causation standard between an adverse employment action and retaliatory animus.[96]

But in the caselaw developed in our Circuit, an employee bringing a retaliation claim under Title VII need not, at the prima facie stage, prove but-for causation.[97] At the prima facie stage, an employee must adduce evidence "sufficient to raise the inference that [his] protected activity was the *likely reason* for the adverse [employment] action."[98] Mr. Patel can meet this burden to demonstrate a causal connection between the protected activity and the adverse employment action by relying on "a broad array" of evidence, including evidence of an employer's inconsistent explanation for the adverse employment action, a pattern of antagonism, or "unusually suggestive" temporal proximity. These are not the only ways to show causation at the prima facie stage and we are directed to consider the proffered evidence as a whole.[99]

Mr. Patel concedes the first and only time he complained about racist comments in the workplace or disparate treatment occurred at his August 30, 2019 meeting with CFO Sobota. He identifies the August 30, 2019 protected activity forming the basis of his retaliation claims:

- When he raised the issue of his compensation, CFO Sobota responded Mr. Patel "made enough" to which Mr. Patel expressed concern he "was not being treated on a level playing field as his Caucasian counterparts";

- He complained about CEO Leo's racist comments "creating a hostile and racist culture … caus[ing] him significant discomfort";

- He complained about Mr. Caldwell's "I can make life very difficult for people like you" comment.

Mr. Patel then identifies CF Fresh's retaliatory conduct:

- His relationship with CFO Sobota deteriorated;

- CFO Sobota stopped communicating with Mr. Patel three weeks after the meeting with Mr. Patel despite regular communication before August 30;

- CFO Sobota cancelled Mr. Patel's anticipated (but no evidence of confirmed) attendance at a Produce Marketing Association sales conference scheduled for September 2019 despite having already received permission to attend;

- CFO Sobota and Chief Human Resources Officer DeLillo asking him questions on November 18, 2019 about his meal expenses and remote work despite never being disciplined or reprimanded for his meal expenses or remote work before August 30;

- Firing him on November 18, 2019.

### 1.    Mr. Patel adduced prima facie evidence of retaliation.

CF Fresh challenges the first and third elements of the prima facie case, arguing Mr. Patel did not engaged in protected activity and even if he had, he cannot demonstrate a causal link between his protected activity and his termination or non-renewal of his Employment Agreement.

There is no dispute Mr. Patel met with Mr. Sobota on August 30, 2019.  Mr. Patel contends he told CFO Sobota on August 30 about Mr. Leo's comments and Mr. Caldwell's "people like you" comment and complained about not being treated on a level playing field as his white counterparts.[100]  CF Fresh first argues Mr. Patel has no protected activity because Mr. Leo's comments about Mexicans, African-Americans, and Jews were not directed to him personally and

21

so his complaints about such comments are not protected by Title VII. It also argues any complaint about Mr. Caldwell's comment does not constitute protected activity as a matter of law because the comment did not mention Mr. Patel's race, ancestry, or other protected characteristic.

We disagree with CF Fresh at least as to Mr. Patel's complaints about Mr. Leo's race-based comments and jokes. Congress's anti-discrimination protections in Title VII aim for "a workplace where individuals are not discriminated against because of their racial, ethnic, religious, or gender-based status."[101] Congress in Title VII "seeks to secure that primary objective by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees."[102] Title VII's "substantive provision seeks to prevent injury to individuals based on who they are, *i.e.*, their status. The antiretaliation provision seeks to prevent harm to individuals based on what they do, *i.e.*, their conduct."[103]

Mr. Patel opposed a practice made unlawful by Congress in Title VII – racist and discriminatory commentary about Hispanics, African-Americans, and Jews; opposed Mr. Caldwell's "people like you" comment; and told CFO Sobota he did not feel the company treated him on an equal playing field as his white counterparts with regard to compensation. CF Fresh focuses on comments made by Mr. Leo about other minority groups and not Mr. Patel as an Asian/Indian man. But the fact Mr. Patel is not Hispanic, African-American, or Jewish does not doom his Title VII retaliation claim. We are instructed by our Court of Appeals in *Moore v. City of Philadelphia* – where the court examined the retaliation claims of white police officers opposing racial discrimination against black officers – "[w]hile white workers may be unable to successfully complain under the antiretaliation provision of Title VII solely because they are required to work in an environment hostile to blacks, if they became the victims of 'materially adverse actions' because they reasonably perceived that environment as violative of Title VII and objected, they

have a valid retaliation claim."[104] By analogy Mr. Patel may have a valid retaliation claim after objecting to comments about Hispanics, African-Americans, and Jews if he reasonably perceived the comments to violate Title VII.

Our Court of Appeals recently informed our analysis by reaffirming this reasoning in *Kengerski v. Harper*.[105] In *Kengerski*, a white  employee sued his employer alleging retaliation for complaining about co-workers' racially offensive comments under Title VII. The employee told his co-workers he and his wife planned to provide care for their grand-niece. A white co-worker asked if the child is black and, after learning the child is bi-racial, called the child a "monkey."[106] The white employee complained to his supervisor about the "monkey" and other racially offensive comments about African Americans and Asians. The employer placed the co-worker who made the "monkey" comment on administrative leave and the co-worker ultimately resigned. The white employee alleged his employer subjected him to harassment and a hostile work environment after reporting the comments. His employer then fired  him seven months later for mishandling a workplace complaint and investigation.[107] The employee challenged his termination as pretext in retribution for reporting the "monkey" and other comments and causing the co-worker's resignation seven months earlier.

The employer moved for summary judgment on the Title VII retaliation claim arguing the employee did not meet the first or third elements of the prima facie case. Judge Ranjan found the employee failed to meet the first element of the prima facie case – protected activity –  and granted the employer's motion without deciding the third element of the prima facie case or addressing pretext. The employee appealed.[108]

Our Court of Appeals saw it differently. It determined the employee met the first element of a prima facie case of retaliation because a "reasonable person could believe" his co-worker's

race-based comments violated Title VII. The court found "Title VII may be violated when an employee's racist behavior creates a hostile work environment for his colleagues."[109] The court noted the employee not only argued his opposition to his co-worker's behavior toward him but also behavior "directed at his coworkers of other races."[110] In such cases, "white plaintiffs are protected from retaliation when they blow the whistle on conduct 'they reasonably perceived … as violative of Title VII' because it was hostile for their black coworkers.'"[111] The court did not address the employee's complaints about conduct directed at other coworkers of color because it found employee reasonably believed his own work environment to be hostile under Title VII, satisfying the first element of his prima facie case.

Our Court of Appeals carefully distinguished between a hostile work environment claim – which the white employee did not bring and neither does Mr. Patel here — and a retaliation claim. Unlike a hostile work environment claim, an employee claiming retaliation "need not show that his working environment in hindsight was actually hostile, only that he held an objectively reasonable belief that it was."[112] The difference between a hostile work environment claim and a retaliation claim "reflects a part of Title VII's purpose to 'encourage employees to report harassing conduct before it becomes severe or pervasive.'"[113] Our Court of Appeals cautioned a retaliation claim "must be tied to Title VII" and "[a]n employee must have complained about the type of conduct that is generally protected by that Title, such as discrimination on the basis of race."[114]

While the court then focused on discrimination based on an employee's association with a person of another race, like a family member – a fact we do not have here – its opinion informs our analysis. Our Court of Appeals in *Kengerski* and *Moore* teaches Mr. Patel may have protected activity meeting the first element of a prima facie retaliation claim under Title VII if he reasonably believed Mr. Leo's race and religious based comments violated Title VII. We reject CF Fresh's

argument Mr. Patel cannot, as a matter of law, maintain a Title VII retaliation claim because race-based comments in the workplace were not directed at him as an Asian man of Indian ancestry.

But we are mindful of our Court of Appeals' cautionary instructions; a retaliation claim "must be tied to Title VII" and complaint about workplace behavior "that is so minor and isolated that it could not remotely be considered extremely serious – that is not within some striking distance of an actual hostile work environment – is not protected because no reasonable person could have believed that it violated Title VII."[115]

While we have concerns about the temporal remoteness of at least some of Mr. Leo's comments and of Mr. Ogorek's comments long before Giorgi's January 2019 acquisition, Mr. Patel alleges Mr. Leo made similar comments post-acquisition, a fact CF Fresh does not seem to contest. At summary judgment, we will construe the facts in favor of Mr. Patel; he complained about racial commentary in the workplace to CFO Sobota as well as a concern the company did not treat him equally as his white counterparts. We find he sufficiently meets the first element of the prima facie claim for Title VII retaliation.

We move to the third element of the prima facie case; causal connection between the protected activity and the adverse employment action. CF Fresh argues Mr. Patel cannot demonstrate a causal link between his protected activity and either the non-renewal of his Employment Agreement and/or his termination. Mr. Patel clarifies his termination constitutes the adverse employment action; he does not argue a retaliatory non-renewal of his Employment Agreement.[116] We examine only a causal connection between Mr. Patel's protected activity on August 30 and his termination two-and-a-half months later on November 18.

Mr. Patel need only produce evidence at the prima facie stage sufficient to raise the inference his protected activity is the *likely reason* for his termination. Mr. Patel relies on temporal

proximity, a pattern of antagonism following his August 30 complaint, and CF Fresh's "implausible rationale" for his termination.

We disagree with Mr. Patel's temporal proximity evidence raises an inference of discrimination. The two-and-a-half-month period between the August 30 meeting and the November 18 termination is not unusually suggestive temporal proximity. In this Circuit, an intervening time period of ***days*** may raise an inference of causation; "a period of two months cannot."[117] As recently as last month, our Court of Appeals found a two-month gap between protected activity and termination "is too long to draw an inference of retaliation."[118]

Where temporal proximity is not unusually suggestive, we also consider additional evidence of discrimination. Here, Mr. Patel points to evidence beginning after his complaints on August 30, CFO Sobota did not speak to him for three weeks, directed him not to attend the California sales conference, and began looking into his attendance and meal expenses where no one ever questioned his attendance and meal expenses, and in fact approved, before August 30. Although the evidence is very thin, we find Mr. Patel satisfies the causal connection element of the prima facie case of retaliation.

### 2.    Mr. Patel cannot show pretext.

Under the *McDonnell Douglas* framework, once Mr. Patel satisfies his burden of establishing a prima facie case of retaliation, the burden shifts to CF Fresh to provide a legitimate, non-retaliatory reason for Mr. Patel's termination. CF Fresh proffered its legitimate, nonretaliatory reason for Mr. Patel's termination: his excessive expensing of personal meals, failing to report to the office for work, and lying to President Matar about where he worked on November 11, 2019.

Under *McDonnell Douglas*, the burden shifts to Mr. Patel to rebut these reasons by showing they are pretextual. At the summary judgment stage, Mr. Patel must produce some evidence from

which the factfinder could reasonably either (1) disbelieve CF Fresh's legitimate reasons; or (2) believe an invidious discriminatory reason is more likely than not a motivating or determinative cause of the termination.[119]

Mr. Patel points to the same evidence he cites in support of the causation element of the prima facie case. He argues an unusually suggestive temporal proximity of two months between his August 30 complaints to CFO Sobota and his November 18 termination; a "pattern of antagonism" shown by CFO Sobota's cessation of communications; CFO Sobota's cancellation of his attendance at the Produce Marketing Association sales conference; and "digging around" for meal expenses and attendance infractions to justify termination. He asks us to find he would decide to lie to his boss about his whereabouts on November 11 even though he allegedly suffered a pattern of hostility in the weeks before he decided to lie. His assumptions are contradicted by the undisputed material facts and common sense. Mr. Patel's suppositions are not sufficient for a factfinder to reasonably either disbelieve CF Fresh's legitimate reasons for termination or believe an invidious discriminatory reason is more likely than not a motivating or determinative cause of Mr. Patel's termination.

As analyzed in the prima facie case section, a two-and-a-half month gap between protected activity and the adverse employment action is not unusually suggestive of retaliatory motive to show pretext. Although there is no "bright-line rule" for the time between protected activity and an adverse employment action, our Court of Appeals finds days, not months, are unusually suggestive.[120] With no unusually suggestive temporal proximity, our Court of Appeals instructs us to view the evidence as a whole including a claims pattern of antagonism. This leaves us with CFO Sobota's cessation of communications for a period of three weeks after the August 30 meeting; CFO Sobota's cancellation on September 18, 2019 of Mr. Patel's approved attendance at the

Produce Marketing Association sales conference; and an alleged "digging" for information on Mr. Patel's meal expensing and workplace attendance.

We find these do not amount to a "pattern of antagonism." Even accepting these events happened as described by Mr. Patel, they occurred two months before his termination. Assuming his allegation CFO Sobota did not speak to him for three weeks after the August 30 meeting – until mid-September – is still one month before his termination and not unusually suggestive of discriminatory animus. Mr. Patel has no evidence CFO Sobota knew of his "implied" attendance at the California sales conference.

We disagree with Mr. Patel's characterization CFO Sobota and Chief Human Resources Officer DeLillo began to "dig up" a reason to terminate him by "hunting for negative information" to "paper" his file and justify his termination. The record shows President Matar, who had no involvement in the decision to terminate Mr. Patel, complained to CFO Sobota she had difficulty locating Mr. Patel when he should have been in the office. CF Fresh's Human Resources department then audited Mr. Patel's attendance, finding between September 3 and November 15, 2019, Mr. Patel failed to report to the office fifteen times. Mr. Patel does not dispute this; he simply concludes President Matar's concern communicated to CFO Sobota and resulting audit must have been retaliatory. And Mr. Patel cannot explain why he misrepresented his work status to President Matar on November 11, 2019.

Mr. Patel also does not dispute he expensed over sixty-seven lunches. CFO Sobota testified someone, possibly in the  accounts payable department, brought these meal expenses to his attention. There is no evidence CFO Sobota investigated these expenses in retaliation for the August 30 complaints or for a reason other than the company's account payable department flagged the problem and notified CFO Sobota. Mr. Patel's argument is simply because he had

always been allowed to expense meals, the accounting department's flagging of excessive expenses proved by an audit must be in retaliation for his August 30 complaints. We conclude a factfinder could not reasonably either disbelieve CF Fresh's legitimate reasons for his termination or believe an invidious discriminatory reason is more likely than not a motivating or determinative cause of the termination. Mr. Patel fails to meet his burden on pretext and we enter judgment in favor of CF Fresh on his retaliation claims.

### D.     Mr. Patel does not dispute judgment dismissing his contract claim.

Mr. Patel claims CF Fresh breached the Employment Agreement by failing to pay him severance. CF Fresh seeks judgment on the breach of contract claim because it timely notified Mr. Patel on August 30, 2019 it would not renew his Employment Agreement on November 2, 2019.

Under the "Term" provision of the Employment Agreement, the "Contract Term" – defined as a one year period – "shall be automatically extended for an additional one-year Contract Term *unless either the Employee or the Company shall have given written notice to the contrary at least two months before the expiration of the current Contract Term*."[121]

Under the "Termination" provision of the Employment Agreement, either party could terminate the contract for any reason on forty-five days' written notice. In event of a termination, the company agreed to pay Mr. Patel severance.[122]

CF Fresh argues the plain terms of the Employment Agreement allowed for non-renewal with two months written notice, it gave such notice, the Agreement does not provide for severance in the event of non-renewal, and only termination of the contract provided for severance. It argues there is no evidence of termination under the "Termination" clause and Mr. Patel fails to cite a provision of the Employment Agreement providing for severance in the event of non-renewal. CF

Fresh further argues even if non-renewal constitutes "Termination," Mr. Patel is not entitled to severance because he did not sign a release, a condition of severance.

Mr. Patel's opposition to summary judgment does not address the breach of contract claim. Once CF Fresh met its burden of showing there is no genuine issue of material fact on the breach of contract claim, Mr. Patel as the non-moving party must identify facts in the record enabling him to make a sufficient showing on the elements of his contract claim. He failed to do so by choosing to ignore the issue in his response brief.[123] Having failed to brief the breach of contract claim in opposition to CF Fresh's summary judgment, Mr. Patel abandoned his claim.[124] We enter judgment in favor of CF Fresh on Mr. Patel's breach of contract claim.

## III.    Conclusion

We grant CF Fresh's motion for summary judgment.

---

[1] Our Policies require parties moving for relief under Fed. R. Civ. P. 56 include a Statement of Undisputed Material Facts ("SUMF") and an appendix to support summary judgment. CF Fresh LLC filed  its SUMF, Motion, and brief in support of summary judgment and Appendix at ECF Doc. Nos. 34, 34–1, 34–2, and 34–3 through 34–5. Mr. Patel filed his response brief, response to CF Fresh's SUMF, and supplemental Appendix at ECF Doc. No. 49, 49–1, and 49–3. Mr. Patel submitted a counter statement of facts at ECF Doc. No. 49–2. CF Fresh replied at ECF Doc. No. 50.

[2] ECF Doc. No. 34–1, CF Fresh SUMF, ¶¶ 1, 3, 4; ECF Doc. No. 34–3, Appendix ("Appx.") 142–147.

[3] ECF Doc. No. 34–3, Appx. 143, § 3; ECF Doc. No. 34–1, CF Fresh SUMF ¶ 5.

[4] ECF Doc. No. 34–4, Appx. 144, § 6; ECF Doc. No. 34–1, CF Fresh SUMF ¶ 5.

[5] ECF Doc. No. 34–4, Appx. 144, § 6; ECF Doc. No. 34–1, CF Fresh SUMF ¶ 6.

[6] ECF Doc. No. 34–1, CF Fresh SUMF ¶ 10.

[7] *Id.*, CF Fresh SUMF ¶ 34.

[8] ECF Doc. No. 49–2, Patel counter SUMF ¶ 9.

[9] *Id.*, Patel counter SUMF ¶¶ 40–42.

[10] *Id.*, Patel counter SUMF ¶¶ 33–43.

[11] *Id.*, Patel counter SUMF ¶ 52.

[12] *Id.*, Patel counter SUMF ¶¶ 10–18. The record shows CEO Leo sent text messages to colleagues, including Mr. Patel and President Matar, on January 25, 2018 with an image of a Mexican man wearing a sombrero with the words: "Mexican Word of the Day: Sh**hole. I asked Hillary if she stole Haitian relief funds and sh**hole me yes." ECF Doc. No. 34–3, Appx. 261. President Matar responded with a laughing emoji. *Id.* On September 25, 2018, CEO Leo texted Mr. Patel an image of Michelle Obama with the words: "Brett Kavanaugh grabbed my penis." *Id.* Appx. 252. Mr. Patel took this to mean CEO Leo considered Michelle Obama, an African-American woman, to look like a man. On November 8, 2018, CEO Leo texted Mr. Patel an image of an African-American child standing under a landmine. *Id.* Appx. 254. On February 8, 2019, CEO Leo texted Mr. Patel photos of Georgia politician and black woman Stacey Abrams beside an image of Jabba the Hutt from the Star Wars movies and an image of a partially eaten ear of corn next to a photo of Ms. Abrams with the words: "Stacy [sic] Abrams was here." *Id.* Appx. 256.

[13] ECF Doc. No. 49–2, Patel counter SUMF ¶¶ 19–21.

[14] ECF Doc. No. 34–1, CF Fresh SUMF ¶ 11.

[15] *Id.*, CF Fresh SUMF ¶ 12.

[16] *Id.*, CF Fresh SUMF ¶ 13.

[17] ECF Doc. No. 34–3, Appx. 377–383.

[18] *Id.*, Appx. 379–380.

[19] *Id.*, Appx. 22–23, S. Patel deposition at 83–86.

[20] ECF Doc. No. 34–1, CF Fresh SUMF ¶ 28; ECF Doc. No. 49–2, Patel counter SUMF ¶ 47. Mr. Patel considered the phrase "people like you" to be racially motivated, threatening, and directed specifically to him as the only person of color at the meeting. *Id.*, Patel counter SUMF ¶ 48.

[21] ECF Doc. No. 49–2, Patel counter SUMF ¶ 52.

[22] ECF Doc. No. 34–1, CF Fresh SUMF ¶ 15; ECF Doc. No. 46–1, Patel response to SUMF ¶ 15.

[23] ECF Doc. No. 34–1, CF Fresh SUMF ¶ 20; ECF Doc. No. 34–3, Appx. 190, 191.

[24] ECF Doc. No. 34–1, CF Fresh SUMF ¶ 21.

[25] ECF Doc. No. 49–1, Patel response to SUMF ¶ 21.

[26] ECF Doc. No. 34–3, Appx. 38, S. Patel deposition at 147.

> Q.      So who first informed you that your employment contract would not be renewed?
>
> A.      Mike Sobota.
>
> Q.      And that was during a meeting that you had with him?
>
> A.      That was the time on August 30th.
>
> Q.      So he told you that verbally then?
>
> A.      Yes.

[27] ECF Doc. No. 49–2, Patel counter SUMF ¶ 54.

[28] ECF Doc. No. 34–1, CF Fresh SUMF ¶ 22.

[29] *Id.*, CF Fresh SUMF ¶¶ 24–29.

[30] ECF Doc. No. 34–1, CF Fresh SUMF ¶¶  27–29.

[31] ECF Doc. No. 34–1, CF Fresh SUMF ¶ 23; ECF Doc. No. 49–1, Patel response to SUMF ¶ 23.

[32] ECF Doc. No. 49–1, Patel response to SUMF ¶ 26.

[33] ECF Doc. No. 34–3, Appx. 37–38, S. Patel deposition at 145–46.

[34] ECF Doc. No. 49–1, Patel response to SUMF ¶ 30.

[35] ECF Doc. No. 34–3, Appx. 148. Again, the parties do not dispute CF Fresh's General Counsel prepared this Notice three days before the August 30 meeting. ECF Doc. No. 34–3, Appx. 190, 191. ECF Doc. No. 49–1, Patel response to SUMF ¶ 20.

[36] ECF Doc. No. 34–1, CF Fresh SUMF ¶ 32. The August 30, 2019 notice is timely non-renewal under the Employment Agreement.

[37] ECF Doc. No. 49–2, Patel counter SUMF ¶¶ 62–64.

[38] *Id.*, Patel counter SUMF ¶¶ 63–64. Mr. Patel offers no evidence of set plans for him to attend this conference before CF Fresh's decision.  And there is no documentary evidence of Mr. Patel's permitted attendance at the sales conference. When asked at his deposition who gave him permission to attend, he swore "it was implied that I needed to be there for sales" and Greg Sagan, the Vice President of Sales, "knew" and "there was no reason to have to even discuss it because Mike – I had that ability to be wherever I needed to be. He gave me that right." ECF Doc. No. 34–3, Appx. 40–41, S. Patel deposition at 157–58 Mr. Patel cannot recall whether he asked CFO

Sobota for permission to attend the meeting. *Id.* CFO Sobota told Mr. Patel not to go to the sales conference around September 18, but Mr. Patel testified he did not know whether CFO Sobota knew of his plans to attend the sales conference. *Id.*, Appx. 41, S. Patel deposition at 160.

[39] ECF Doc. No. 34–1, CF Fresh SUMF ¶ 34.

[40] *Id.*, CF Fresh SUMF ¶ 36. Mr. Patel concedes CFO Sobota's testimony but denies his deficient performance, denies CF Fresh communicated performance issues to him, and contends there is no evidence documenting performance issues. ECF Doc. No. 49–1, Patel response to SUMF ¶ 36.

[41] ECF Doc. No. 34–1, CF Fresh SUMF ¶ 37.

[42] *Id.*, CF Fresh SUMF ¶ 38. Mr. Patel did not have a reporting relationship to Mr. Caldwell. *Id.*, CF Fresh SUMF ¶ 35.

[43] *Id.*, CF Fresh SUMF ¶¶ 39–41.

[44] ECF Doc. No. 49–2, Patel counter SUMF ¶¶ 36–39.

[45] ECF Doc. No. 34–1, CF Fresh SUMF ¶¶ 51–53.

[46] ECF Doc. No. 49–1, Patel response to SUMF ¶¶ 50–54.

[47] The parties do not identify "Cindy." Based on our search of the record, Mr. Patel testified "Cindy" was a subordinate of Mr. Stalloni and "a staff member." ECF Doc. No. 34–3, Appx. 173, S. Patel deposition at 20.

[48] The parties do not identify "Greg" but we assume it is Greg Sagan, Vice President of Sales.

[49] ECF Doc. No. 34–3, Appx. 150.

[50] *Id.*, Appx. 149.

[51] *Id.*, Appx. 182, S. Patel deposition at 55–56.

[52] *Id.*, Appx. 186–188.

[53] ECF Doc. No. 34–1, CF Fresh SUMF ¶¶ 55–60. No party disputes Giorgi terminated another employee, a white man, in 2017 for lying as to his location during work hours. Mr. Patel challenges this employee as an improper comparator because we are not given the employee's position within the company. The fact remains Giorgi terminated the employee, whatever his position, for lying as to his location during work hours.

CFO Sobota prepared a memo within a week of firing Mr. Patel on November 18, 2019 detailing the events leading to CF Fresh's decision. ECF Doc. No. 34–3, Appx. 90–95; Appx. 84, M. Sobota deposition at 104. CFO Sobota outlines issues with Mr. Patel's performance and behavior on

February 15, 2019, May 9 and 24, 2019, June 28, 2019, July 18 and 30, 2019, August 9, 2019, August 15, 16, and 30, 2019, September 16, 19, 23, 2019, and November 11 and 18, 2019. *Id*, Appx. 90–95. CFO Sobota testified he prepared the memo consistent with the company's policy to document the reasons for termination. ECF Doc. No. 8–1. Neither party included Mr. Patel's September 14, 2020 EEOC charge in the summary judgment Appendix. This document is critical to the timeliness of Mr. Patel's claims. The date of Mr. Patel's first EEOC charge – September 14, 2020 – is exactly 301 days after his November 18, 2019 termination. The 300th day fell on Sunday, September 13, 2020, and Mr. Patel filed his charge on the next business day, Monday, September 14, 2020. As addressed in our Analysis section, there is a 300-day statute of limitations applicable to Title VII claims. There is no administrative exhaustion for section 1981 claims

[54] ECF Doc. No. 34–1, CF Fresh SUMF ¶ 63. Mr. Patel admitted this fact. *See* ECF Doc. No. 49–1, Patel response to SUMF ¶ 63.

[55] ECF Doc. No. 34–3, Appx. 50, S. Patel deposition at 195–96.

[56] *Id.*, Appx. 11–12, S. Patel deposition at 41–42.

[57] *Id.*, Appx. 50, S. Patel deposition at 195. Mr. Patel "admitted that Mr. Caldwell was not his boss, he did not report to Mr. Caldwell, and there is no evidence that Mr. Caldwell was involved in the termination of [Mr. Patel's] employment." ECF Doc. No. 34–1, CF Fresh SUMF ¶ 64. Mr. Patel denied this fact, contenting he "specifically testified that he believed that Mr. Caldwell was involved in his termination decision given his role with the company." ECF Doc. No. 49–1, Response to SUMF ¶ 64. Mr. Patel chose not to depose Mr. Caldwell or produce evidence to support his belief or guess as to Mr. Caldwell's involvement in firing him.

[58] ECF Doc. No. 8–1. Neither party included Mr. Patel's September 14, 2020 EEOC charge in the summary judgment Appendix. This document is critical to the timeliness of Mr. Patel's claims. The date of Mr. Patel's first EEOC charge – September 14, 2020 – is exactly 301 days after his November 18, 2019 termination. The 300th day fell on Sunday, September 13, 2020, and Mr. Patel filed his charge on the next business day, Monday, September 14, 2020. As addressed in our Analysis section, there is a 300-day statute of limitations applicable to Title VII claims. There is no administrative exhaustion for section 1981 claims.

[59] ECF Doc. No. 33–4, Appx. 151–157.

[60] ECF Doc. No. 1, ¶ 5.

[61] ECF Doc. No. 1.

[62] Mr. Patel's EEOC charge checked discrimination based on race and national origin. His amended Complaint alleges discrimination based on race and ancestry. Discrimination based on ancestry or ethnic characteristics constitutes racial discrimination under section 1981. *St. Francis College v. Al-Khazraji*, 481 U.S. 604 (1987). National origin claims "have been treated as ancestry or ethnicity claims in some circumstances" and "in the Title VII context, the terms overlap as a legal matter." *Id.* at 614 (Brennan, J., concurring).

[63] ECF Doc. No. 34. Summary judgment is proper when "the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those 'that could affect the outcome' of the proceeding, and 'a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party.'" *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011)). "Summary judgment is appropriate only if, after drawing all reasonable inferences in favor of the non-moving party, there exists 'no genuine dispute as to any material fact' and the movant 'is entitled to judgment as a matter of law.'" *Moyer v. Patenaude & Felix, A.P.C.*, 991 F.3d 466, 469 (3d Cir. 2021) (quoting *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 770 (3d Cir. 2018)). We do not weigh evidence or make credibility determinations. *Peroza-Benitez v. Smith*, 994 F.3d 157, 164 (3d Cir. 2021) (quoting *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019)).

"The party seeking summary judgment 'has the burden of demonstrating that the evidentiary record presents no genuine issue of material fact.'" *Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016) (quoting *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015)). If the movant carries its burden, "the nonmoving party must identify facts in the record that would enable them to make a sufficient showing on essential elements of their case for which they have the burden of proof." *Willis*, 808 F.3d at 643 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "If, after adequate time for discovery, the nonmoving party has not met its burden, pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against the nonmoving party." *Id.* (citing *Celotex*, 477 U.S. at 322–23).

[64] 42 U.S.C. § 2000e-2(a)(1).

[65] 42 U.S.C. § 2000e-3(a).

[66] 42 U.S.C. § 1981(a). *See also CBOCS West, Inc. v. Humphries*, 553 U.S. 442 (2008) (section 1981 encompasses retaliation claims).

[67] 42 U.S.C. § 2000e-5(e).

[68] *Watson v. Eastman Kodak Co.*, 235 F.3d 851, 854 (3d Cir. 2000).

[69] *Id.*

[70] *See* ECF Doc. No. 8–1.

[71] ECF Doc. No. 34–3, Appx. 151.

[72] ECF Doc. No. 49 at 13. The two cases cited by Mr. Patel found adverse actions failing outside the 300-day statutory period are not actionable but can be considered as "background evidence of discrimination." *See Smith v. RB Distrib., Inc.*, 498 F. Supp. 3d 645, 655, n.1 (E.D. Pa. 2020); *Stewart v. Rutgers, the State Univ.*, 120 F.3d 426, 433 (3d Cir. 1997). His response clarifies non-renewal is a fact we may consider as background evidence when evaluating his discrimination claim ECF Doc. No. 49 at 13. Mr. Patel does not argue the non-renewal of his Employment

Agreement is an independent basis for his discrimination and retaliation claims under section 1981. Any such claim is waived and we will not consider it here.

[73] 411 U.S. 792 (1973). Title VII and section 1981 employment discrimination claims are analyzed in the same way. The substantive elements of a race discrimination claim under section 1981 are "generally identical" to the elements of a Title VII employment discrimination claim. *Carvalho–Grievous v. Delaware State Univ.*, 851 F.3d 249, 256–57 (3d Cir. 2017) (quoting *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 181–82 (3d Cir. 2009)).

[74] Mr. Patel agrees the *McDonnel Douglas* burden-shifting analysis applies here. He does not argue Mr. Caldwell's "you people" comment is direct evidence of discrimination. *See* ECF Doc. No. 49 at 10–18.

[75] *Kengerski v. Harper*, 6 F. 4th 531, 536 n. 3 (3d Cir. 2021).

[76] *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994) (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

[77] *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008); *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410–11 (3d Cir. 1999).

[78] *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003) (cleaned up).

[79] Although it argued Mr. Patel's claim alleging non-renewal of the Employment Agreement based on race and ancestry is time-barred, CF Fresh appears to alternatively argue there is no evidence non-renewal is based on his race and/or ancestry even if the claim is not time-barred.

[80] No. 13-6728, 2015 WL 9260031 (E.D. Pa. Dec. 18, 2015).

[81] *Kamara*, 2015 WL 9260031, at * 7.

[82] *See e.g. Dykes v. Marco Grp., Inc.*, 222 F. Supp. 3d 418, 428–29 (E.D. Pa. 2016) (comment to an African-American employee by non-decisionmaker "we don't like your kind" did not support a reasonable inference plaintiff's termination was racially motivated).

[83] *Burrows v. Twp. of Logan*, 415 F. App'x 379, 383–84 (3d Cir. 2011) (emphasis in original) (quoting *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 333–34 (3d Cir. 1995) and *Walden v. Georgia–Pacific Corp.*, 126 F.3d 506, 521 (3d Cir. 1997)).

[84] *Udasco-Kist v. Thomas Jefferson Univ. Hosp., Inc.*, No. 21-1146, 2022 WL 2805131, * 3 (3d Cir. July 18, 2022) (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992)).

[85] ECF Doc. No. 34–3, Appx. 186–88.

[86] *Ali v. Woodbridge Twp. Sch. Dist.*, 957 F.3d 174, 180 (3d Cir. 2020).

[87] *Canada v. Samuel Grossi & Sons, Inc.*, 49 F.4th 340, 347 (3d Cir. 2022) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)). *See also Coley v. New Jersey Transit Corp.*, No. 21-2373, 2022 WL 5240385, at *3 (3d Cir. Oct. 6, 2022) (quoting *Fuentes*, 32 F.3d at 765) (To show pretext, Mr. Patel must "either (1) submit evidence that 'meaningfully throw[s] into question, i.e., [casts] substantial doubt upon' the employer's proffered reason, or (2) 'come forward with sufficient evidence from which a factfinder could reasonably conclude that an illegitimate factor more likely than not was a motivating or determinative cause of the adverse employment decision.'").

[88] *Canada*, 49 F.4th at 347 (quoting *Fuentes*, 32 F.3d at 765).

[89] *See* ECF Doc. No. 49 at 19, incorporating Section III(C)(2) of his brief addressing causal connection between his protected activity and termination to support a prima facie case of retaliatory discharge.

[90] *Canada*, 49 F.4th at 346.

[91] *Id.* (quoting *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015)).

[92] *Id.*

[93] *Carvalho–Grievous,* 851 F.3d at 257.

[94] *Id.* at 257–58.

[95] *Id.* at 258 (explaining *Woodson v. Scott Paper Co.*, 109 F.3d 913 (3d Cir. 1997) and *Moore v. City of Phila.*, 461 F.3d 331 (3d Cir. 2006)).

[96] *Id.*

[97] *Id.* at 259.

[98] *Id.* at 259 (quoting *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997) (emphasis added)).

[99] *Id.* at 260.

[100] Mr. Patel does not assert he complained to CFO Sobota about Mr. Ogorek's comments. *See* ECF Doc. No. 49–2, Patel counter SUMF ¶¶ 55–57. CFO Sobota swore Mr. Patel did not raise inappropriate or offensive comments in the workplace, including Mr. Caldwell's comment. *See* ECF Doc. No. 34–3, Appx. 80, M. Sobota deposition at 85.

[101] *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006).

[102] *Id.*

---

[103] *Id.*

[104] *Moore v. City of Phila.*, 461 F.3d 331, 342 (3d Cir. 2006) (footnote omitted).

[105] 6 F. 4th 531, 534 (3d Cir. 2021).

[106] *Id.* at 534.

[107] *Id.* at 535.

[108] *Id.* at 536.

[109] *Id.* at 537 (footnote omitted).

[110] *Id.* at 537, n. 6.

[111] *Id.* (quoting *Moore,* 641 F.3d at 342).

[112] *Id.* at 537.

[113] *Id.* (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 764 (1998)).

[114] *Id.*

[115] *Id.* (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001)).

[116] *See* ECF Doc. No. 49 at 16–18. For example, Mr. Patel argues he: "can also establish a causal connection between his protected activity ***and his termination***"; "can establish temporal proximity between his complaint ***and termination***"; "[CF Fresh] simply built a case against [him] throughout the six weeks following his complaint ***to justify his termination***;" and "[a]ll of these factors case serious doubt upon the legitimacy of [CF Fresh's] articulated reasons for [his] ***termination***" (emphasis added).

[117] *Carvalho-Grevious*, 851 F.3d at 261, n.8.

[118] *Koslosky v. Am. Airlines, Inc.*, No. 20-2081, 2022 WL 4481537, at * 2 (3d Cir. Sept. 27, 2022). In *Koslosky*, our Court of Appeals analyzed temporal proximity in the context of a pretext analysis.

[119] *Fuentes*, 32 F.3d at 764.

[120] *See Dondera v. Lower Milford Twp.*, 5 F. 4th 355, 361–62 (3d Cir. 2021) (five month gap is not unusually suggestive temporal proximity in a First Amendment retaliation claim); *Duncan v. Chester Cnty. Hosp.*, 677 F. App'x 58, 62 (3d Cir. 2017) (thirty-four days is not by itself unduly suggestive); *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007) (a three month gap between the protected activity and adverse action, without more, cannot create an inference of causation).

[121] ECF Doc. No. 34–3, Appx. 143, § 3 (emphasis added).

[122] *Id.*, Appx. 144, § 6.

[123] *See Player v. Motiva Enter., LLC*, 240 F. App'x 513, 522 n. 4 (3d Cir. 2007) ("If the moving party has satisfied its initial burden [on summary judgment], the nonmoving party must, in their opposition to the motion, identify evidence of record that creates a genuine issue of material fact") (citing *Childers v. Joseph*, 842 F.2d 689, 694–95 (3d Cir. 1988)).

[124] *McCowan v. City of Phila.*, --- F. Supp. 3d ---, No. 19-3326, 2022 WL 1557779, at * 16 (E.D. Pa. May 17, 2022) ("when a plaintiff fails to raise an argument in opposition not a motion for summary judgment, it is waived, and [he] cannot later argue the issue on appeal") (citing *Player*, 240 F. App'x at 522 n. 4). *See also Campbell v. Jefferson Univ. Physicians*, 22 F. Supp. 3d 478, 487 (E.D. Pa. 2014) ("when a plaintiff responds to a defendant's summary judgment motion but fails to address the substance of any challenge to particular claims, that failure 'constitutes an abandonment of th[o]se causes of action and essentially acts as a waiver of these issues.'") (quoting *Skirpan v. Pinnacle Health Hosp.*, No. 07-1703, 2010 WL 3632536, at *6 (M.D. Pa. Apr. 21, 2010)).